Gwendolyn SCHUSTER and Robert Schuster,
Plaintiffs-Appellants,

v.

Barry M. ALTENBERG, M.D., Chubb Insurance
Group and Wisconsin Patient Compensation
Fund, Defendants-Respondents.

Supreme Court

*No. 87–0115. Argued February 2, 1988.—Decided June 1, 1988.*

(Also reported in 424 N.W.2d 159.)

225

For the plaintiffs-appellants there were briefs (in court of appeals) by *Gregory Van Remmen* and *Albert, Jude & Van Remmen, S.C.,* Racine, and oral argument by *John Albert.*

For the defendants-respondents there was a brief (in court of appeals) by *Donald R. Peterson, Janet E. Kolar* and *Peterson, Johnson & Murray, S.C.,* Milwaukee, and oral argument by *James T. Murray, Jr.*

LOUIS J. CECI, J.  This case is before the court on certification from the court of appeals, pursuant to sec. (Rule) 809.61, Stats. The appellants, Gwendolyn and Robert Schuster, appeal from a judgment of the trial court granting the motion of respondents, Barry M. Altenberg, M.D., Chubb Insurance Group, and the Wisconsin Patient Compensation Fund, for judgment on the pleadings.

Due to the fact that judgment on the pleadings was granted, the facts presented are sparse. Edith Schuster, the mother of Gwendolyn Schuster and the wife of Robert Schuster, was a patient of Dr. Altenberg, a psychiatrist. In the complaint, it was alleged:

> "Dr. Altenberg was negligent in his management and care for Edith Schuster in failing to recognize or take appropriate actions in the face of her psychotic condition, including failing to seek her commitment, to modify her medication, to alert and warn the patient or her family of her condition or its dangerous implications ...."[1]

---

[1] A submission of controversy filed with the patients compensation panel and attached to the complaint similarly asserted that Dr. Altenberg: "Failed to properly diagnose and treat the patient in the midst of her manic-depressive state by not hospitalizing her, by administering inappropriate drugs, and by not warning the

The appellants additionally asserted that Dr. Altenberg's negligence was a substantial contributing factor in causing an automobile accident that occurred on June 29, 1983, in which Gwendolyn Schuster was injured and Edith Schuster, who was driving, was fatally injured. Gwendolyn Schuster was paralyzed as a result of the accident and claimed damages associated with her paraplegia in the form of pain, suffering, disability, medical expense, and loss or impairment of earning capacity. Robert Schuster claimed damages resulting from his obligation to pay significant medical expenses of his daughter while she was a minor.

The negligence claim originated as a submission of controversy filed with the patients compensation panel. Subsequently, the patients compensation panel was abolished by 1985 Wisconsin act 340. On June 27, 1986, this action was commenced in the circuit court for Racine county, in accordance with the provisions of 1985 Wisconsin act 340, providing for the transfer of pending controversies. An amended complaint was filed on September 17, 1986. The respondents filed a motion for judgment on the pleadings on September 22, 1986, pursuant to sec. 802.06(3), Stats. Toward the end of oral argument on the motion for judgment on the pleadings, the appellants requested the opportunity to replead. The trial court refused permission to replead and, on December 19, 1986, entered judgment granting the motion for judgment on the pleadings and dismissing the amended complaint.

Gwendolyn and Robert Schuster appealed from the judgment of dismissal. The court of appeals

patient or her family of the risks and dangerousness of her condition and risk control and therapeutic requirements."

certified this case, and, on September 22, 1987, the certification of the appeal was accepted.

■

Motions made pursuant to sec. 802.06(3), Stats., for judgment on the pleadings are related to motions for summary judgment under sec. 802.08(2). Specifically, a motion for judgment on the pleadings will be converted to a motion for summary judgment if matters outside the pleadings are presented to the court. Sec. 802.06(3). Consequently, it has been observed that "a judgment on the pleadings is, in reality, a summary judgment minus affidavits and other supporting documents." Clausen & Lowe, *The New Wisconsin Rules of Civil Procedure Chapters 801–803,* 59 Marq. L. Rev. 1, 55–56 (1976). For this reason, in reviewing an order granting judgment on the pleadings, we follow the methodology for reviewing summary judgments set forth in *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). First, we examine the complaint to determine whether a claim for relief has been stated. In determining the legal sufficiency of the complaint, "the facts pleaded by the plaintiff, and all reasonable inferences therefrom, are accepted as true." *Prah v. Maretti,* 108 Wis. 2d 223, 229, 321 N.W.2d 182 (1982). The complaint should be found legally insufficient only if "'it is quite clear that under no circumstances can the plaintiff recover.'" *Id.* (quoting Clausen & Lowe, *supra* at 54.) If a claim for relief has been stated, we then turn to the responsive pleadings to determine whether a material factual issue exists. Finally, if no genuine issue of material fact exists, the court may determine that the moving party is entitled to a judgment as a matter of law.

For the purposes of addressing the legal sufficiency of the complaint, we have categorized the allegations as follows:

(1) Negligent diagnosis and treatment;

(2) Failure to warn the patient's family of her condition and its dangerous implications; and

(3) Failure to seek the commitment of the patient.

## I.

It is well established in Wisconsin that a medical practitioner, "be he a general practitioner or a specialist, should be subject to liability in an action for negligence if he fails to exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances." *Shier v. Freedman,* 58 Wis. 2d 269, 283–84, 206 N.W.2d 166, 208 N.W.2d 328 (1973). Liability will not be imposed under this negligence standard for mere errors in judgment:

> "The law governing this case is well settled. A doctor is not an insurer or guarantor of the correctness of his diagnosis; the requirement is that he use proper care and skill. *Knief v. Sargent,* 40 Wis. 2d 4, 8, 161 N.W.2d 232 (1968). The question is not whether the physician made a mistake in diagnosis, but rather whether he failed to conform to the accepted standard of care. *Francois v. Mokrohisky,* 67 Wis. 2d 196, 201, 226 N.W.2d 470 (1975)." *Christianson v. Downs,* 90 Wis. 2d 332, 338, 279 N.W.2d 918 (1979).

We can conceive of no reason why a psychiatrist, as a specialist in the practice of medicine, should not be compelled, as are all other practitioners, to meet the accepted standard of care established by other practitioners in the same class. *See Gordon v. Milwaukee County,* 125 Wis. 2d 62, 370 N.W.2d 803 (Ct. App. 1985). Accordingly, liberally construed, the complaint at the very least asserts a claim for negligent treatment and diagnosis.

The only distinction between the allegations of negligent treatment and diagnosis in the present case and those which constitute most malpractice claims is the type of harm which resulted. However, a negligent failure to diagnose or properly treat a psychiatric condition may constitute the cause-in-fact of harm to the patient and third parties if it can be established that with proper diagnosis and treatment the patient's condition and behavior could have been corrected or controlled. In a related matter, the court in *Stokes v. Leung,* 651 S.W.2d 704 (Tenn. Ct. App. 1982), recognized a claim asserting that failure to prescribe proper medication was a factor causal in a patient's act of committing suicide. Moreover, under the allegation that Dr. Altenberg failed to warn Edith Schuster of the dangerous implications of her disease, it might be established that with proper diagnosis, the patient would have been warned not to drive until her condition was corrected. Warning a patient of risks associated with a condition and advising the patient as to appropriate conduct constitutes treatment as to which the physician must exercise ordinary care. *See generally* Annotation, *Liability of Physician, for Injury to or Death of Third Party, Due to Failure to Disclose Driving-Related Impediment,* 43 A.L.R.4th

230

153, sec. 4(b) (1986). For example, in *Duvall v. Goldin,* 139 Mich. App. 342, 352, 362 N.W.2d 275, 279 (Ct. App. 1984), the court found that it was "foreseeable that a doctor's failure to diagnose or properly treat an epileptic condition may create a risk of harm to a third party." More specifically, the court noted that it was foreseeable that such failure to diagnose and treat, including the failure to warn a patient not to operate a motor vehicle, could result in an automobile accident. *Id. See also Freese v. Lemmon,* 210 N.W.2d 576 (Iowa 1973). Finally, expert testimony might explain that the only proper course of treatment for Edith Schuster was confinement, which, if accomplished, would have prevented her from driving and, consequently, would have avoided the accident. Whether Dr. Altenberg was in fact negligent in diagnosing and treating Edith Schuster and whether such misdiagnosis and improper treatment was a substantial factor in causing the accident and consequential injuries are issues for the jury to resolve.

Directly related to the issue of improper diagnosis and treatment is the issue of the alleged failure to warn the patient of the side effects or risks associated with the medication prescribed. This allegation, specifically argued on appeal, is not immediately apparent from the allegations in the complaint. However, liberally construed, the complaint and the submission of controversy attached thereto support this allegation.

[7]

This court has not previously addressed precisely the issue of liability of a psychiatrist to third parties for failure to warn a patient of a medication's side effects. *But see Trogun v. Fruchtman,* 58 Wis. 2d 569, 604, 207 N.W.2d 297 (1973) (recognizing cause of

231

action in negligence for failure to inform patient of risk information in connection with contemplated treatment). However, other courts which have addressed the issue have found such a failure to warn to constitute a basis upon which a psychiatrist could be held liable to a third party. *See generally* Annotation, *Liability of Physician, for Injury to or Death of Third Party, Due to Failure to Disclose Driving-Related Impediment, supra* p. 230, at sec. 4(a). For example, in *Kaiser v. Suburban Transp. Sys.,* 65 Wash. 2d 461, 398 P.2d 14, *corrected on other grounds* 401 P.2d 350 (1965), *disapproved on other grounds, Pederson v. Dumouchel,* 72 Wash. 2d 73, 431 P.2d 973 (1967), the Washington Supreme Court held that a physician could be held liable for injuries resulting to bus passengers from an accident in which a bus driver experienced a lapse in consciousness as a result of side effects of a drug which had been prescribed without appropriate warning as to side effects. More generally, in *Gooden v. Tips,* 651 S.W.2d 364, 369 (Tex. Ct. App. 1983), the court held that "it is apparent that, under proper facts, a physician can owe a duty to use reasonable care to protect the driving public where the physician's negligence in diagnosis or treatment of his patient contributes to plaintiff's injuries." In Wisconsin, a party is negligent if it was foreseeable that the party's act or omission to act could cause harm to someone. *A. E. Investment Corp. v. Link Builders, Inc.,* 62 Wis. 2d 479, 484, 214 N.W.2d 764 (1974). *See also Coffey v. Milwaukee,* 74 Wis. 2d 526, 536, 247 N.W.2d 132 (1976). Consequently, in Wisconsin, a psychotherapist may be held liable in negligence for failure to warn of the side effects of a medication if the side effects were such that a patient should have been cautioned against driving, because it was foresee-

able that an accident could result, causing harm to the patient or third parties if the patient drove while using the medication.

## II.

Less matter of course than the appellants' allegations regarding negligent diagnosis and treatment are the allegations that Dr. Altenberg negligently failed to warn Edith Schuster's family of her condition or its dangerous implications.[2] This claim is distinct from the above-discussed malpractice allegations, since it concerns not the treatment of Edith Schuster, but Edith Schuster's conduct insofar as third persons might be threatened. Additionally, the appellants have alleged that Dr. Altenberg negligently failed to "seek [the] confinement" of Edith Schuster. From this

---

[2]Generally, in reviewing a trial court's dismissal of a case, once this court has determined that a claim for relief has been stated as to one particular theory, the court will not proceed to determine what additional theories alleged are valid. *See Ollerman v. O'Rourke Co., Inc.,* 94 Wis. 2d 17, 51, 288 N.W.2d 95 (1980). We depart from this principle in the instant case upon the requests of both parties and in the interest of judicial economy. Moreover, it is imperative that all of the claims made in the complaint be addressed since, contrary to the dismissal at issue in *Ollerman,* the claims as to the existence of a duty to third parties were specifically addressed and rejected by the trial court in the case at bar. Accordingly, unless we address these claims as to failure to warn and failure to confine, the appellants will unequivocally not have the "opportunity to prove their case" as to these independent claims. Concurring op. at 267. Thus, we disagree with the position of the concurrence which posits that merely because we have found a claim to have been stated as to negligent treatment and diagnosis, we should bar the appellants from developing the remaining claims at trial by refusing to review the trial court's dismissal of those claims.

allegation it may be reasonably inferred that the claim encompasses a failure to induce voluntary commitment under sec. 51.10, Stats., or to initiate proceedings for either emergency detention under sec. 51.15, or involuntary commitment under sec. 51.20. While this allegation, like that concerning the alleged failure to warn, concerns the notion of a psychotherapist's duty to third persons, commitment may in certain instances likewise constitute an appropriate course of treatment. Notwithstanding the fact that commitment may, in certain instances, be therapeutic, we analyze failure to commit alongside the allegations of failure to warn third parties, since commitment is paramountly justified as a measure to protect the public.

The trial court found, and the respondents argue, that absent a readily identifiable victim, there exists no duty on the part of a psychiatrist to warn third parties of, or protect third parties from, the conduct of a patient. The analysis and rationale underlying the "readily identifiable victim" doctrine has its roots in cases from other jurisdictions which have developed from the seminal case of *Tarasoff v. Regents of University of California,* 17 Cal. 3d 425, 551 P.2d 334, 131 Cal. Rptr. 14 (1976). Appellants argue that the readily identifiable victim theory is inconsistent with basic principles of Wisconsin tort law. We agree and consequently commence our analysis with a review of the fundamental notions of duty and foreseeability under Wisconsin tort law.

In *A. E. Investment,* this court held that an architect could be held liable to a third person with whom he was not in privity of contract. The defense therein to liability was that the architect had "no duty" to the third party and consequently could not be

held liable. The court rejected the "narrow concept of duty" and reaffirmed its commitment to the minority position articulated in *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928). *A. E. Investment,* 62 Wis. 2d at 483. The court explained the proper analysis of duty as follows:

> "A defendant's duty is established when it can be said that it was foreseeable that his act or omission to act may cause harm to someone. A party is negligent when he commits an act when some harm to someone is foreseeable. Once negligence is established, the defendant is liable for unforeseeable consequences as well as foreseeable ones. In addition, he is liable to unforeseeable plaintiffs.
>
> * * *
>
> "As held in *Schilling* [*v. Stockel,* 26 Wis. 2d 525, 133 N.W.2d 335 (1965)], once it is determined that a negligent act has been committed and that the act is a substantial factor in causing the harm, the question of duty is irrelevant and a finding of nonliability can be made only in terms of public policy." *Id.* at 484–85. *See also Antoniewicz v. Reszczynski,* 70 Wis. 2d 836, 856–57, 236 N.W.2d 1 (1975).

Application of these principles resulted in the court's finding that the architect could be held liable to a tenant of the building designed and constructed under a contract with developers for failure to provide for soil condition which had caused the floor to settle and consequential damage. Further, and of obvious significance to the case at bar, the court stated:

> "The very essence of a profession is that the services are rendered with the understanding that

the duties of the profession cannot be undertaken on behalf of a client without an awareness and a responsibility to the public welfare.

\* \* \*

"Professionalism is the very antithesis to irresponsibility to all interests other than those of an immediate employer." *A. E. Investment,* 62 Wis. 2d at 488–89.

Likewise, in *Auric v. Continental Cas. Co.,* 111 Wis. 2d 507, 331 N.W.2d 325 (1983), the court held that an attorney may be held liable in negligence to a beneficiary of a will who was not in privity with the attorney. In so holding, the court noted that the question of whether liability should be imposed upon the attorney to a third-party beneficiary was one of public policy. 111 Wis. 2d at 512.

A similar attempt to limit liabilities to third parties was rejected in *Citizens State Bank v. Timm, Schmidt & Co., S.C.,* 113 Wis. 2d 376, 335 N.W.2d 361 (1983). In *Citizens State Bank,* the court held that absence of privity does not bar negligence actions. Additionally, the court refused to limit the scope of those third parties to whom accountants could be held liable to a particular group of persons who were expected to gain access to prepared information. Rather, the court appropriately hearkened back to the general principles of Wisconsin negligence law, noting such a restriction would not be consistent with "[t]he fundamental principle of Wisconsin negligence law ... that a tortfeasor is fully liable for all foreseeable consequences of his act except as those consequences are limited by policy factors." *Id.* at 386.

As succinctly stated in *Coffey,* 74 Wis. 2d at 537, it is a fundamental precept of Wisconsin negligence law

that "[t]he concept of duty in Wisconsin, as it relates to negligence cases, is inexorably interwoven with foreseeability." That liability extends to third parties where it is foreseeable that one's conduct may cause harm to another is, moreover, not foreign to negligence law as applied to the medical profession. Specifically, in *Christianson,* the court recognized a cause of action alleging negligence in failing to identify and treat members of a family where a patient had been diagnosed with measles or where the doctor had negligently failed to make the diagnosis. 90 Wis. 2d at 339. Liability of physicians for permitting exposure to infectious or contagious diseases is well established. Annotation, *Liability of Physician for Permitting Exposure to Infectious or Contagious Disease,* 5 A.L.R. 926 (1920). A natural extension of the principle under which a physician may be liable to third parties as a consequence of his or her patient's contagious disease is the liability of a psychotherapist to third parties for injuries caused by his or her patient. In *McIntosh v. Milano,* 168 N.J. Super. 466, 490, 403 A.2d 500, 512 (1979), the New Jersey Superior Court explained the analogy well: "To an admittedly uncertain but nevertheless sufficient extent, 'dangerousness' must be considered identifiable . . . and although not a 'disease' as that term is commonly used, may affect third persons in much the same sense as a disease may be communicable." *See also Peck v. Counseling Service of Addison County,* 146 Vt. 61, 65, 499 A.2d 422, 425 (1985).

More generally, the above-discussed cases demonstrate that reliance upon a no duty-no liability theory is misplaced in Wisconsin: a "duty" exists when it is established that it was foreseeable that an act or

omission to act may cause harm to someone. *A. E. Investment,* 62 Wis. 2d at 483. Consequently, the duty to warn or to institute commitment proceedings is not limited by a requirement that threats made be directed to an identifiable target. However, we emphasize that in determining whether harm was foreseeable, the psychotherapist is not held to a standard of omniscience, but merely to "that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances." *Shier,* 58 Wis. 2d at 382–84. Stated otherwise, a psychotherapist would not be found negligent for failing to predict dangerousness or for failing to take action to protect the patient from himself or herself, or a third party from the patient, unless it is established by expert testimony that by so acting the doctor failed to conform to the accepted standard of care.

Moreover, we are not tempted to depart from general principles of negligence in the present case, notwithstanding that recognition of a claim for relief encompassing a duty to warn or to institute detention or commitment proceedings for a dangerous individual might be characterized as an imposition of an affirmative duty to act.[3] In this regard, we highlight

[3]Under Wisconsin's broad definition of duty, we need not engage in analytical gymnastics to arrive at our result by first noting that at common law, a person owes no duty to control the conduct of another person or warn of such conduct, and then finding exception to that general rule where the defendant stands in a special relationship to either the person whose conduct needs to be controlled or in a relationship to the foreseeable victim of the conduct. *See, e.g.,* Restatement (Second) of Torts § § 314–20 (1965) and *Tarasoff,* 17 Cal. 3d at 435–36, 551 P.2d at 343, 131 Cal. Rptr. at 23.

this court's decision in *Walker v. Bignell,* 100 Wis. 2d 256, 301 N.W.2d 447 (1981), wherein the court examined the relationship between foreseeability and duty in the context of the issue of municipal liability for failure to keep weeds and brush cut at highway intersections. While acknowledging Dean Prosser's observation that at common law, courts have generally avoided the imposition of affirmative conduct upon others, the court noted:

> "But this is a negligence suit, and the parties have spoken of duty in a second respect: the defendants' duty of *reasonable care.* Although we have stated that one's duty to exercise reasonable care must be attached to some other conduct, *Fitzgerald v. Ludwig,* 41 Wis. 2d 635, 638, 165 N.W.2d 158 (1969), the essence of that duty is not to do, or refrain from doing, a particular act, but rather to act in a particular way—to exercise reasonable care—whenever it is foreseeable that one's conduct may cause harm to another. *Coffey v. Milwaukee,* 74 Wis. 2d 526, 536, 247 N.W.2d 132 (1976); *A. E. Investment Corp. v. Link Builders, Inc.,* 62 Wis. 2d 479, 483, 214 N.W.2d 764 (1974). Thus within the framework of a negligence case the particular conduct of a defendant is not examined in terms of whether or not there is a duty to do a specific act, but rather whether the conduct satisfied the duty placed upon individuals to exercise that degree of care as would be exercised by a reasonable person under the circumstances. *See: Ceplina v. South Milwaukee School Board,* 73 Wis. 2d 338, 342, 243 N.W.2d 183 (1976)." *Id.* at 263–64 (emphasis in original).

■ We hold that Wisconsin negligence law precludes a holding that a psychotherapist does not have a duty

to warn third parties or to institute proceedings for the detention or commitment of a dangerous individual for the protection of the patient or the public. In the instant case, if it is ultimately proven that it would have been foreseeable to a psychiatrist, exercising due care, that by failing to warn a third person or by failing to take action to institute detention or commitment proceedings someone would be harmed, negligence will be established.

## III.

In sum, we find that as to the latter two broadly categorized allegations, failure to warn and failure to seek commitment, as with respect to the negligent treatment and diagnosis allegations, the pleadings establish grounds upon which a jury could find negligence and could further find such negligence to have constituted the cause-in-fact of the injury. Nevertheless, "'Liability does not necessarily follow even when negligence and negligence as a cause-in-fact of injury are present. Public policy considerations may preclude liability.'" *Garrett v. City of New Berlin,* 122 Wis. 2d 223, 233, 362 N.W.2d 137 (1985) (quoting *Morgan v. Pennsylvania General Ins. Co.,* 87 Wis. 2d 723, 737, 275 N.W.2d 660 (1979)). As to the first claim, concerning negligent treatment and diagnosis, there are no meritorious public policy grounds which would require that liability generally not be imposed. In particular, there is no basis upon which a psychotherapist should ordinarily be excused from liability for failing to warn of the side effects of a particular medication. However, arguments have been presented regarding the inherent difficulty in the prediction of human behavior which suggest that to impose liability

upon a psychotherapist for negligent diagnosis and treatment would be unduly burdensome and thus contrary to public policy. Additional public policy considerations are addressed with respect to the failure-to-warn and the failure-to-confine allegations.

Ordinarily, this court will not decide public policy issues before a full factual resolution of the claims at trial. *Coffey,* 74 Wis. 2d at 543. However, it is not always necessary to remand for trial prior to addressing public policy considerations: "This court has noted that application of the public policy tests as to recovery of damages '... does not in all cases require a full factual resolution of the cause of action by trial before policy factors will be applied by the court. ...'" *Rieck v. Medical Protective Co.,* 64 Wis. 2d 514, 520, 219 N.W.2d 242 (1974) (quoting *Hass v. Chicago & North Western Ry. Co.,* 48 Wis. 2d 321, 326–27, 179 N.W.2d 885 (1970)). *See also Wilson v. Continental Ins. Cos.,* 87 Wis. 2d 310, 324, 274 N.W.2d 679 (1979). In the present case, both parties have sought resolution of public policy considerations implicated in this case. Additionally, the record before us indicates that in rendering the judgment on the pleadings, the trial judge fully addressed the policy issues he found determinative. Consequently, the posture of this case is proper for the resolution of the fundamental issues of public policy underlying this case. *Antoniewicz,* 70 Wis. 2d at 841–42. We therefore proceed to determine whether public policy would generally preclude the imposition of liability in all cases in which allegations of a psychotherapist's negligent treatment and diagnosis, failure to warn third parties, or failure to seek commitment are made. We premise our discussion of public policy by emphasizing that we are herein concerned with public policies which are outlined in

support of the proposition that there should be no liability under these theories in any circumstances; we do not purport to consider those factual circumstances which may be shown, after a full trial, to warrant nonliability in a particular case.[4]

Those factors which have been frequently cited as public policy considerations are as follows:

> "(1) the injury is too remote from the negligence; or
> "(2) the injury is too wholly out of proportion to the culpability of the negligent tort-feasor; or
> "(3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or
> "(4) allowance of recovery would place too unreasonable a burden on the negligent tort-feasor; or

---

[4]We emphasize that, contrary to the assertions of the concurrence, this decision does not involve "sweeping pronouncements" as to third-party liability; this decision merely rejects misdirected attempts to preclude liability based upon such claims in all cases. Concurring op. at 264. We further note that contrary to the inverted logic of the concurrence, it is precisely because we address public policy to determine whether liability can never be imposed, rather than investigate policies for the purpose of limiting liability under factually specific circumstances, that our discussion of public policy is appropriate. The trial judge in the case at bar considered the policies embedded in the issue of psychotherapist liability to third parties and determined that these considerations mandated a requirement that such claims allege a specifically identifiable victim in order to be sustained. We only go so far as to review public policies concerning the trial court's holding that liability can never attach absent a targeted victim. Under this holding, Dr. Altenberg retains the opportunity to fully present his case at trial and to develop facts which might, as to this particular case, indicate that public policy does not permit the imposition of liability.

"(5) allowance of recovery would be too likely to open the way for fraudulent claims; or

"(6) allowance of recovery would enter a field that has no sensible or just stopping point." *Garrett,* 122 Wis. 2d at 233–34.

In our examination of the public policy considerations regarding the imposition of liability for harm resulting from the acts of a dangerous patient, we have surveyed cases from other jurisdictions which have addressed this issue. Our analysis of cases from other jurisdictions must necessarily commence with the landmark *Tarasoff* case. In *Tarasoff,* the plaintiffs, the parents of a woman killed by a patient of a psychologist, claimed that the psychologist should be held liable in negligence for failure to warn them of impending danger and for failure to bring about the patient's confinement. The patient had confided his intention to kill the plaintiffs' daughter to the psychologist. As to the liability of a therapist in such circumstances, the court explained:

"When a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist to take one or more of various steps, depending upon the nature of the case. Thus it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances." *Tarasoff,* 17 Cal. 3d at 431, 551 P.2d at 340, 131 Cal. Rptr. at 20.

243

Notably, the duty which was recognized in *Tarasoff* was not limited to a duty to warn but extended to "whatever other steps are reasonably necessary under the circumstances." *Id.* While the decision is principally noted for its holding establishing a duty to warn third parties, the duty recognized in *Tarasoff* was significantly broader.

In fact, commentators have observed that an interpretation of *Tarasoff* as limited to a requirement of warning third parties miscomprehends the broader standard of reasonable care to protect a victim articulated in *Tarasoff.* Givelber, Bowers & Blitch, *Tarasoff, Myth and Reality: An Empirical Study of Private Law in Action,* 1984 Wis. L. Rev. 443, 465–67. More recently, medical and legal commentators have observed that *Tarasoff* "mandates a duty to protect, not specifically to warn. Protecting includes conventional clinical interventions such as reassessment, medication changes, or hospitalization designed to relieve the patient's symptoms." Mills, Sullivan & Eth, *Protecting Third Parties: A Decade After Tarasoff,* 144 Am. J. Psych. 68, 71 (Jan. 1987).[5]

---

[5]In a treatise discussed in the *Tarasoff* decision, Fleming & Maximov, *The Patient or His Victim: The Therapist's Dilemma,* 62 Cal. L. Rev. 1025, 1065–66 (1974), the authors emphasized that what may constitute a reasonable measure will vary according to the nature of the threat posed by a patient:

> "[W]hen danger is imminent and action of some sort imperative, the therapist should select the form of intervention with the least harmful impact upon the patient's interests. In some cases the patient's vengeful intent is firmly set, in others it is not. In some the potential victim is specific and identified, in others the victim is unknown or the threat generalized. Sometimes it may be possible to protect the prospective victim without the patient ever knowing, at other times only physician restraint will suffice. The range of

Insofar as the respondents base much of their argument upon the alleged impossibility of a prediction of dangerousness, this argument suggests that "allowance of recovery would place too unreasonable a burden on the negligent tort-feasor." *Garrett,* 122 Wis. 2d at 234. A like argument was promoted and rejected in *Tarasoff:*

> "The role of the psychiatrist, who is indeed a practitioner of medicine, and that of the psychologist who performs an allied function, are like that of the physician who must conform to the standards of the profession and who must often make diagnoses and predictions based upon such evaluations. Thus the judgment of the therapist in diagnosing emotional disorders and in predicting whether a patient presents a serious danger of violence is comparable to the judgment which doctors and professionals must regularly render under accepted rules of responsibility.
>
> "We recognize the difficulty that a therapist encounters in attempting to forecast whether a patient presents a serious danger of violence. Obviously we do not require that the therapist, in making that determination, render a perfect performance; the therapist need only exercise 'that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of

---

alternatives open to the therapist is wide: he may choose to warn the victim or the police, with or without disclosure to the patient in advance or afterwards; he may persuade the patient to accept voluntary commitment, refer him to a halfway facility of some kind, or recommend involuntary commitment. Whatever the choice, it must be weighed against overcaution. Like premature action, action more drastic than necessary to afford reasonable protection for the third party subjects the patient to unwarranted invasion of his rights."

[that professional specialty] under similar circumstances.' . . . Within the broad range of reasonable practice and treatment in which professional opinion and judgment may differ, the therapist is free to exercise his or her own best judgment without liability; proof, aided by hindsight, that he or she judged wrongly is insufficient to establish negligence." 17 Cal. 3d at 438, 551 P.2d at 345, 131 Cal. Rptr. at 25 (citations omitted).

Stated otherwise:

"It may be true that there cannot be 100% accurate prediction of dangerousness in all cases. However, a therapist does have a basis for giving an opinion and a prognosis based on the history of the patient and the course of treatment. Where reasonable men might differ and a fact issue exists, the therapist is only held to the standard for a therapist in the particular field in the particular community. Unless therapists clearly state when called upon to treat patients or to testify that they have no ability to predict or even determine whether their treatment will be efficacious or may even be necessary with any degree of certainty, there is no basis for a legal conclusion negating any and all duty with respect to a particular class of professionals." *McIntosh,* 168 N.J. Super. at 482, 403 A.2d at 508 (footnote omitted). *See also Gordon,* 125 Wis. 2d at 69.

As to the argument of the unpredictability of human behavior, it is additionally both interesting and important to note that a finding of "dangerousness" forms the basis of the involuntary commitment under ch. 51, Stats. *See* sec. 51.20.[6] To hold that evaluation of a

---

[6]Section 51.20, Stats., provides in relevant part as follows:

patient by a psychotherapist under this standard is so plagued with uncertainty as to be without value would raise "serious questions ... as to the entire present

"**Involuntary commitment for treatment.** (1) PETITION FOR EXAMINATION. (a) Except as provided in pars. (ab), (am) and (ar), every written petition for examination shall allege that the subject individual to be examined:

"1. Is mentally ill, drug dependent, or developmentally disabled and is a proper subject for treatment; and

"2. Is dangerous because the individual:

"a. Evidences a substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm;

"b. Evidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm. ...

"c. Evidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself. The probability of physical impairment or injury is not substantial under this subparagraph if reasonable provision for the subject individual's protection is available in the community, if the individual is appropriate for placement under s. 55.06 or, in the case of a minor, if the individual is appropriate for services or placement under s. 48.13(4) or (11). ...

"d. Evidences behavior manifested by recent acts or omissions that, due to mental illness, he or she is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation or serious physical disease will imminently ensue unless the individual receives prompt and adequate treatment for this mental illness. No substantial probability of harm under this subparagraph exists if reasonable provision for the individual's treatment and protection is available in the community, if the individual can receive protective placement under s. 55.06 or, in the case of a minor, if the individual is appropriate for services or placement under s. 48.13(4) or (11). ..."

247

basis for commitment procedures." *McIntosh,* 168 N.J. Super. at 495, 403 A.2d at 514. *See also Lipari v. Sears, Roebuck & Co.,* 497 F. Supp. 185, 192 (D. Neb. 1980).

Of further significance is the fact that a survey of psychotherapists suggests that practitioners are quite confident of their ability to assess dangerousness: "[T]he task of assessing dangerousness is not viewed as being beyond the competence of individual therapists or as a matter upon which therapists cannot agree." Givelber, Bowers & Blitch, *supra* p. 18, at 486. To hold that a psychotherapist may be held liable when it is established that he or she has negligently failed to evaluate a patient's dangerousness, or failed to take appropriate action to protect the patient and public from these qualities, is not to impose liability upon a psychotherapist for all harm caused by a patient. Rather, liability will only result where expert testimony establishes that the diagnosis or treatment was not consistent with the accepted standard of care. With regard specifically to the allegation of negligent failure to commit, unless it could be established that the patient was a proper subject for involuntary commitment under the statutory standards, the psychotherapist could not be held liable for injury caused as a result of his or her failure to seek emergency detention or to initiate commitment proceedings. *See, e.g., Soutear v. United States,* 646 F. Supp. 524, 536 (E.D. Mich. 1986) ("Although hospitalization and medication would have undeniably been the best treatment for the patient, the decision of the doctors at the VA hospital to abandon legal commitment proceedings and the absence of a warning of dangerousness did not breach their duty to his parents.").

An additional public policy implicated in the determination of whether liability should not be imposed for failure to warn or to seek confinement, and which is fervently argued by respondents, is the need to protect confidential patient-therapist communication. The concern regarding the preservation of patient trust in the confidentiality of communications is legitimate, yet one which must yield in those limited circumstances where the public interest in safety from violent assault is threatened. The reason why the interest of public safety commands some limited intrusion upon confidentiality was well explained in *Tarasoff:*

> "Our current crowded and computerized society compels the interdependence of its members. In this risk-infested society we can hardly tolerate the further exposure to danger that would result from a concealed knowledge of the therapist that his patient was lethal." 17 Cal. 3d at 442, 551 P.2d at 347, 131 Cal. Rptr. at 27.

In this regard, we further find that a duty to institute commitment proceedings may be triggered not only by the threat an individual patient may pose to the public, but also by the threat an individual may pose to himself or herself.[7] In such instances where a

---

[7] As to the duty which arises where a patient's condition is one which threatens his or her own life, one author has opined:

"Giving full ambit to psychological justifications for not confining patients unless absolutely necessary, suicidal symptoms may be so apparent that confinement would be ordered by a psychiatrist of ordinary skill. For example, if an individual has made serious suicidal attempts, has been deeply depressed, has suffered loss of sleep, appetite, and in effect is almost unable to function in society, but his psychiatrist has declined to have him placed in a

patient evinces imminent suicidal tendencies, a negligence claim takes on the hue of an ordinary malpractice action to the extent that commitment may, if established by expert testimony, be the only proper course of treatment.

We further note that, in Wisconsin, the principle that confidentiality of communications must give way to certain instances is reflected in the evidence code. In particular, sec. 905.04, Stats., accords to a patient a privilege to refuse to disclose and to prevent another person from disclosing confidential patient-therapist communications.[8] However, an exception to this privilege is recognized: "There is no privilege under this rule as to communications and information relevant to an issue in proceedings to hospitalize the patient for mental illness, *if the physician ... or psychologist in the course of diagnosis or treatment has determined*

---

hospital, the psychiatrist might be held liable for the individual's subsequent suicide."

Schwartz, *Civil Liability for Causing Suicide: A Synthesis of Law and Psychiatry,* 24 Vand. L. Rev. 217, 246 (1971). *See generally* Annotation, *Liability of Doctor, Psychiatrist, or Psychologist for Failure to Take Steps to Prevent Patient's Suicide,* 17 A.L.R.4th 1128, § 6 (1982); Annotation, *Liability of Mental Care Facility for Suicide of Patient or Former Patient,* 19 A.L.R.4th 7, § 12 (1983).

[8]Section 905.04(2), Stats., provides in relevant part as follows:

"(2) **General rule of privilege.** A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made or information obtained or disseminated for purposes of diagnosis or treatment of the patient's physical, mental or emotional condition, among the patient, the patient's physician, the patient's registered nurse, the patient's chiropractor, the patient's psychologist or persons, including members of the patient's family, who are participating in the diagnosis or treatment under the direction of the physician, registered nurse, chiropractor or psychologist."

*that the patient is in need of hospitalization."* Sec.
905.04(4)(a). (Emphasis added.) At the very least, the
statutory exception to the evidentiary privilege sug-
gests a balance struck by the legislature between
patient confidentiality and public safety. More gener-
ally, the exception to the general rule of privilege
demonstrates that "the privilege is not sacrosanct and
can properly be waived in the interest of public policy
under appropriate circumstances." *Peck,* 146 Vt. at 67,
499 A.2d at 426. Nevertheless, our analysis of the
psychotherapist-patient privilege is made with recog-
nition that sec. 905.04 is an evidentiary privilege
which does not otherwise affect the ethical duty of
psychotherapists to keep communications confiden-
tial. As to the broader duty of confidentiality, we have
considered the principles of medical ethics governing
psychiatrists. Section 4 of The Principles of Medical
Ethics adopted by the American Psychiatric Associa-
tion provides generally:

> "A physician shall respect the rights of pa-
> tients, of colleagues, and of other health profession-
> als, and shall safeguard patient confidences within
> the constraints of the law." American Psychiatric
> Association, The Principles of Medical Ethics with
> Annotations Especially Applicable to Psychiatry
> (1986 ed.).

The annotations accompanying this general rule of
confidentiality highlight the particularly sensitive
nature of psychiatrist-patient communications but
give recognition to the need for exception to this
general rule of confidentiality:

> "Because of the sensitive and private nature of the
> information with which the psychiatrist deals,
> he/she must be circumspect in the information

251

that he/she chooses to disclose to others about a patient. The welfare of the patient must be a continuing consideration.

*   *   *

*"Psychiatrists at times may find it necessary, in order to protect the patient or the community from imminent danger, to reveal confidential information disclosed by the patient." Id.* (Emphasis added.)

Consequently, even under the broader ethical duty of confidentiality, this duty finds exception where disclosure is necessary "to protect the patient or the community from imminent danger." *Id.* In fact, the results of one survey indicate:

> "The criticism leveled at compromising professional ethics by elevating the therapists' obligation to the public over their obligation to patients also has proved to be unfounded. Most therapists in the study did not perceive a contradiction between professional and personal ethics on the one hand, and taking responsibility for the welfare of those threatened by their patients on the other." Melella, Travin, & Cullen, *The Psychotherapist's Third-Party Liability For Sexual Assaults Committed By His Patient,* 15 J. Psych. & Law 83, 99 (1987). *See also* Givelber, Bowers & Blitch, *supra* p. 18, at 486.

Respondents contend that if a psychiatrist must breach patient confidences, public policy mandates that this duty be limited to situations where there is a readily identifiable target.[9] In *Thompson v. County of*

---

[9]Earlier in this opinion, we explained that the readily identifiable victim doctrine is not amenable to Wisconsin negligence law as a factor limiting "duty." We separately discuss

*Alameda,* 27 Cal. 3d 741, 614 P.2d 728, 167 Cal. Rptr. 70 (1980), the Supreme Court of California delineated a limit upon the liability outlined in *Tarasoff.* In *Thompson,* an institutionalized juvenile released from county custody into his mother's care had indicated that "he would, if released, take the life of a young child residing in the neighborhood." *Id.* at 746, 614 P.2d at 730, 167 Cal. Rptr. at 72. The juvenile did, within 24 hours of release, murder the plaintiffs' son. The county's decision to release was accorded statutory immunity. The plaintiffs additionally asserted negligence in failing to warn the patient's mother, the police, and neighborhood parents of the danger. This claim was rejected, and the *Tarasoff* case was distinguished, since the juvenile had not targeted any "readily identifiable" victims in his threats. *Id.* at 753–54, 614 P.2d at 734, 167 Cal. Rptr. at 76. Some other courts have similarly followed the readily identifiable victim analysis.[10] However, as discussed in *Brady v. Hopper,* 570 F. Supp. 1333 (D. Colo. 1983), *aff'd* 751 F.2d 329 (10th Cir. 1984), these decisions are premised upon the majority opinion in *Palsgraf,* in

whether liability should be limited, as a matter of public policy, to those situations where a patient has identified a victim.

[10]*See generally* Annotation, *Liability of One Treating Mentally Afflicted Patient for Failure to Warn or Protect Third Persons Threatened by Patient,* 83 A.L.R.3d 1201 (1978). *See also Brady v. Hopper,* 570 F. Supp. 1333 (D. Colo. 1983), *aff'd* 751 F.2d 329 (10th Cir. 1984); *Hasanei v. United States,* 541 F. Supp. 999 (D. Md. 1982); *Leedy v. Hartnett,* 510 F. Supp. 1125 (M.D. Pa. 1981), *aff'd* 676 F.2d 686 (3d Cir. 1982); *Cooke v. Berlin,* 153 Ariz. 220, 735 P.2d 830 (Ct. App. 1987); *Williams v. Sun Valley Hospital,* 723 S.W.2d 783 (Tex. Ct. App. 1987). *But see Jablonski by Pahls v. United States,* 712 F.2d 391 (9th Cir. 1983) (psychological profile indicating violence against women close to patient sufficiently "targeted").

which duty is measured by the foreseeability of harm to a particular plaintiff. Specifically, the court in *Brady* explained:

> "However, the legal obstacle to the maintenance of this suit is that there is no relationship between [the psychiatrist] and *plaintiffs* which creates any legal obligation from [the psychiatrist] to these plaintiffs. As explained by Justice Cardozo, negligence is a matter of relation between the parties, and must be founded upon the foreseeability of harm to the person in fact injured. *Palsgraf v. Long Island R. Co.*, 162 N.E. at 101." 570 F. Supp. at 1339 (emphasis in original).

As discussed more completely above, Wisconsin has rejected this negligence formulation in favor of the *Palsgraf* minority view. Accordingly, since the "legal obstacle" of foreseeability of harm to the person in fact injured is not one which exists in Wisconsin, the "readily identifiable victim" restriction upon a psychotherapist's liability is of no import in Wisconsin.

In this regard, we note that we can conceive of no legitimate policy reason which could operate to support a distinction between a psychotherapist's duty to warn on the basis of whether the patient particularizes potential victims of his or her violent tendencies or makes generalized statements of dangerous intent. Certainly, if a patient announces an intention to, for example, leave the psychotherapist's office and commit random acts of violence, the psychotherapist would be unable to warn victims of potential danger and would arguably unjustifiably impinge upon the patient's privacy interests by attempting generalized public warnings. *See, e.g., Thompson,* 27 Cal. 3d 741, 614 P.2d 729, 167 Cal. Rptr. 70 (allegation that

warnings to neighborhood parents were necessary). Nevertheless, notwithstanding the absence of a readily identifiable victim, warnings could, in certain instances, effectively be made to, perhaps, the patient's family or police. However, the query as to who might be the appropriate party to warn in light of a general threat to the public is, for the most part, a misdirected question. Specifically, where a patient's dangerous tendencies are imminent yet generalized, the only effective recourse for the psychiatrist or psychologist, in most instances, would be to contact the police in order to institute emergency detention proceedings.[11]

---

[11]Section 51.15, Stats., reads in relevant part as follows:

"**Emergency detention.** (1) BASIS FOR DETENTION. (a) A law enforcement officer or other person authorized to take a child into custody under ch. 48 may take an individual into custody if the officer or person has cause to believe that such individual is mentally ill, drug dependent or developmentally disabled, and that the individual evidences:

"1. A substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm;

"2. A substantial probability of physical harm to other persons as manifested by evidence of recent homicidal or other violent behavior on his or her part, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm on his or her part;

"3. A substantial probability of physical impairment or injury to himself or herself due to impaired judgment, as manifested by evidence of a recent act or omission. . . .;

"4. Behavior manifested by a recent act or omission that, due to mental illness or drug dependency, he or she is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation or serious physical disease will imminently ensue unless the individual receives prompt and adequate treatment for this mental illness or drug dependency. . . .

Society must not become the victim of a dangerous patient's ambiguity. Stated otherwise:

> "In some circumstances, when the potential victim is an unidentified individual or group (as in the *Lipari* case), the only responsible intervention may be clinical—for example, hospitalization.
>
>           *   *   *
>
> "Specifically, when a psychiatrist is genuinely concerned about a patient's propensity for immediate violence, he or she should initiate civil commitment of the patient at once." Mills, Sullivan & Eth, *supra* p. 18, at 71–72.

To focus upon the issue of appropriate warnings where the patient does not identify those at risk suggests that the streets must be cleared of potential victims; however, it is the patient, perhaps himself or herself a "victim" of a mental disease, who must be temporarily removed from the streets until treatment assures that the patient is no longer an imminent threat to himself or herself or to the community. In fact, at least one commentator has suggested that both the public and patient's interests are always better served by the institution of commitment proceedings as opposed to warning third parties:

> "But the primary inadequacy of the [*Tarasoff*] court's holding is not that it does not give serious thought to protecting the public, but rather that the duty it would impose is self-defeating, increasing, rather than reducing, the overall risk. *It*

> "(b) The officer's or person's belief shall be based on a specific recent overt act, attempt or threat to act or omission made by the individual and observed by or reliably reported to the officer or person."

> *[warnings to third parties] is highly disruptive of the patient-therapist relationship and a less appropriate way of protecting those threatened by dangerous patients than the traditional alternatives of commitment or simply informing the police.*" Stone, *The Tarasoff Decisions: Suing Psychotherapists to Safeguard Society,* 90 Harv. L. Rev. 358, 377 (1976). (Emphasis added.)

Less critical of the effect of warning third parties, but similarly suggesting the warnings alone may be an ineffective way to protect third parties, is the following view propounded by more recent commentators:

> "[W]arning the police.and third parties ... is not necessarily the best way to protect third parties or to help patients. This is not to say that warning cannot be useful. Warning third parties has been shown to be a therapeutic option that can contribute to the patient's progress in therapy. However, warning alone does not always protect third parties. Clearly, use of both warning and clinical remedies such as reassessment, consultation, changes in medication, or civil commitment offers more protection for third parties as well as help for potentially violent patients." Mills, Sullivan & Eth, *supra* p. 18, at 73.

Some jurisdictions which have limited the scope of psychotherapist liability to warning "readily identifiable" third parties have refused to hold psychotherapists liable for failure to commit. *See, e.g., Currie v. United States,* 836 F.2d 209 (4th Cir. 1987). However, such a distinction which recognizes a duty to warn identifiable victims and refuses to impose liability for failure to commit is puzzling indeed, since disclosure to the police or proper authorities of information for the purpose of initiating commitment proceedings

257

implicates a lesser degree of potential impingement upon the psychotherapist-patient relationship than would disclosure to a targeted victim, because these individuals are presumably trained and experienced to appropriately handle such information. Moreover, whereas a warning of a psychotherapist to a member of the public has questionable therapeutic value to the patient, commitment often is an appropriate part of a patient's treatment. Mills, Sullivan & Eth, *supra* p. 18, at 73. Interestingly, an empirical study regarding the response to the *Tarasoff* case indicates that psychotherapists rarely find a situation of dangerousness ripe only for warning: "Most respondents, however, almost never merely warned the victim; in all but three per cent of the cases where a warning was issued, they also initiated or recommended the notification of others or sought hospitalization." Melella, Travin & Cullen, *supra* p. 25, at 100.

Other courts have similarly approached the issue of psychotherapist liability by emphasizing that once it has been established that the patient has dangerous tendencies which would, to a psychotherapist exercising reasonable care, indicate foreseeable harm to someone, that response which would be reasonable will vary under the circumstances.[12] For example, the court in *Lipari* applied Nebraska law to hold:

---

[12]The concurrence supposes that we have delineated the "scope" of a psychotherapist's duty. Concurring op. at 265. This is true only, however, to the extent that we impose a duty upon a psychotherapist to act "reasonably" under the circumstances with which he or she is presented. This holding does not involve an expansion of principles of tort law, but a refusal to impose restrictions upon the application of these principles to psychotherapists.

"[T]his court refuses to rule as a matter of law that a reasonable therapist would never be required to take precautions other than warnings, or that there is never a duty to attempt to detain a patient. These issues can only be determined after the parties have had an opportunity to prove what precautions a reasonable psychotherapist would take under the circumstances in issue here." 497 F. Supp. at 193.

Similarly, in *Littleton v. Good Samaritan Hospital,* Nos. 9872, 9886 (Ohio Ct. App. May 28, 1987),[13] in a case involving the negligent release of a psychiatric patient, the court stated:

"Although *Tarasoff* focused on the defendant's failure to warn the would-be victim, the therapist's duty was actually held to be much broader. Once a therapist does in fact determine, or under applicable professional standards reasonably should have determined, that a patient poses a serious threat of violence to others, he bears a duty to exercise reasonable care to protect the foreseeable victim of that danger. *Id.* at 431, 551 P.2d at 340. The adequacy of the therapist's conduct is thus measured according to the traditional negligence standard of reasonable care under the circumstances. The duty could therefore include warning the potential victim, warning others who are in a position to apprise or protect the potential victim of the danger, calling the police, hospitalizing the patient, or any reasonable action dependent on the circumstances."

---

[13]The Supreme Court of Ohio granted review of this decision on December 9, 1987 (No. 87–1308).

*See also McIntosh,* 168 N.J. Super. at 489, 403 A.2d at 511–12 ("a psychiatrist or therapist may have a duty to take whatever steps are reasonably necessary to protect an intended or potential victim of his patient ...."); and *Petersen v. State,* 100 Wash. 2d 421, 671 P.2d 230 (1983) (following *Lipari* and including within the scope of reasonable precautions the need to petition the court for an additional 90-day commitment).[14]

Additional public policy arguments propose that the imposition of liability upon a physician for failure to warn or failure to commit risks overcommitment and may discourage psychotherapists from treating dangerous patients. Similar concerns had been expressed by critics of *Tarasoff.* However, data collected in a survey of the impact of *Tarasoff* demonstrated that "*Tarasoff* has not discouraged therapists from treating dangerous patients, nor has it led to an increased use of involuntary commitment of patients perceived as dangerous." Givelber, Bowers & Blitch, *supra* p. 18, at 486. *See also* Melella, Travin, & Cullen, *supra* p. 25, at 100. As to these concerns, we further note that imposition of a duty to protect third persons

---

[14]For cases recognizing a claim for relief regarding negligent release, see: *Hicks v. United States,* 511 F.2d 407 (D.C. Cir. 1975) (negligent release); *Pangburn v. Saad,* 73 N.C. App. 336, 326 S.E.2d 365 (Ct. App. 1985) (negligent release allegedly responsible for patient stabbing sister 16 hours after release); *Durflinger v. Artiles,* 234 Kan. 484, 673 P.2d 86 (1983) (duty to exercise reasonable care in discharging psychiatric patient); *Bradley Center, Inc. v. Wessner,* 250 Ga. 199, 296 S.E.2d 693 (1982) (negligent release of voluntarily committed patient); and *Cain v. Rijken,* 300 Or. 706, 717 P.2d 140 (1986) (issue of negligent conditional release, based upon statutorily imposed duty to protect public, not proper for summary judgment where foreseeability of released patient causing harm to third party as a result of reckless driving presented issue of fact).

from the violent propensities of a patient has been found to be consistent with the ethical obligations perceived by psychotherapists to govern their behavior notwithstanding any legal obligation. *See* Givelber, Bowers & Blitch, *supra* p. 18, at 473–76, 486; and Mills, Sullivan & Eth, *supra* p. 18, at 69–70. Likewise, we have considered the legislative policy concerning ch. 51 which seeks to provide for the "least restrictive treatment." Section 51.001, Stats. As to this concern, we find the rationale articulated by the court in *Lipari* compelling:

> "The recognition of this duty does not make the psychotherapist liable for any harm caused by his patient, but rather makes him liable only when his negligent treatment of the patient caused the injury in question.

> \* \* \*

> "Thus, despite the defendant's protests to the contrary, a psychotherapist is not subject to liability for placing his patient in a less restrictive environment, so long as he uses due care in assessing the risks of such a placement. This duty is no greater than the duty already owing to the patient." 497 F. Supp. at 192–93.

Finally, the mere initiation of detention or commitment proceedings does not threaten the patient's constitutionally protected liberty. Chapter 51 assures a constitutionally proper procedure which must be followed in order to secure the emergency detention or commitment of an individual.

██
In sum, there most assuredly exist meritorious public policy concerns regarding the imposition of liability upon psychotherapists for harm resulting

from the dangerous acts of their patients. These arguments, including confidentiality, unpredictability of dangerousness of patients, concerns that patients are assured the least restrictive treatment and that imposition of liability will discourage physicians from treating dangerous patients, present significant issues of public policy. However, neither the possible impact that limited intrusions upon confidentiality might have upon psychotherapist-patient relations, nor the potential impact that the imposition of liability may have upon the medical community with respect to treatment decisions, warrants the certain preclusion of recovery in all cases by patients and by the victims of dangerous patients whose harm has resulted directly from the negligence of a psychotherapist. Accordingly, we find, for the reasons set forth above, that the complaint sets forth allegations as to which a jury could find negligence and cause-in-fact regarding: (1) negligent diagnosis and treatment, including failure to warn of side effects of medication; (2) failure to warn the patient's family members; and (3) failure to seek commitment. Further, we conclude, as to each of the allegations, that there exists no public policy which would justify a holding under which a psychotherapist would not under any circumstances be held liable for failure to warn or commit where negligence and cause-in-fact are established. We qualify, however, our holding insofar as public policy is concerned, with the note that there may in this or in other cases, as developed in a full trial, nevertheless exist circumstances, such as where the injury is "too remote" from the negligence, in which public policy mandates against the imposition of liability. We merely hold that there are no compelling public policy reasons

which warrant a holding that these allegations generally fail to state a claim.

Accordingly, because a claim for relief has been stated as to each of the allegations set forth in the complaint, and because the material facts are undeveloped and disputed, we reverse the trial court's order for judgment on the pleadings. Finally, we do not need to reach, and consequently do not address, the alleged error for failure to grant leave to amend the pleadings, since we have found the pleadings, liberally construed, to state a legally cognizable claim as to each of the allegations upon which the appellants seek relief.

*By the Court.*—The judgment of the circuit court is reversed, and the cause is remanded for further proceedings consistent with this opinion.

STEINMETZ, J. (concurring). The facts of this case are different from those in the typical physician malpractice case. The plaintiff is not the patient; the claim is brought by third parties to the physician-patient relationship. The claim is not brought to redress injury suffered directly by the patient, but rather it is brought to seek compensation for injury suffered by a third party, allegedly as a result of the doctor's negligent diagnosis or treatment of the patient.

I agree for the reasons set forth in the majority opinion that this case raises factual issues as to whether Dr. Altenberg was negligent in diagnosing and treating Edith Schuster and, if so, whether the misdiagnosis and improper treatment were substantial factors in causing the accident and consequential injuries. I further agree that if Dr. Altenberg breached his duty of care in diagnosing and treating Edith

Schuster, he is potentially liable to unforeseen plaintiffs for unforeseen consequences. The jury may have to determine factual issues regarding the alleged failure to warn the patient of the side effects or risks associated with any medication prescribed. Thus, I agree that the trial court erred in granting defendants' motion on the pleadings, because plaintiffs did state a legally recognized claim for malpractice in the portion of the complaint alleging negligent diagnosis and treatment.

However, I believe that the majority goes too far in its holding, at least under the limited facts presented in the pleadings of this case, that a claim for relief was stated in the allegations that Dr. Altenberg negligently failed to warn the patient's family of her condition and that he failed to institute commitment proceedings for Edith Schuster. Contrary to the majority's assertion, the current law of negligence in Wisconsin is not so broad as to automatically encompass these claims. I firmly believe that this court is ill-advised to broaden the basis for a psychotherapist's liability to third parties under the concededly "sparse" facts alleged in the complaint.

All we know about this case is that the plaintiff's mother, who had received psychiatric care from a psychiatrist on a voluntary outpatient basis, had a single-car accident resulting in her death and in plaintiff's tragic injuries. On this information alone, the majority makes sweeping pronouncements about third-party liability of therapists for failure to warn others about their patients and failure to confine patients. This case is simply not ripe—from a factual perspective—to determinate these issues, notwithstanding any encouragement offered by the parties to do so.

It may be true that Wisconsin law would permit a holding that a psychiatrist or psychotherapist has a duty of some type to warn third parties of a dangerous patient or, when necessary, to institute detention or commitment proceedings in order to confine a dangerous individual for the protection of the patient or third parties. However, this is not the same as saying, as does the majority, that Wisconsin negligence law precludes a holding that a psychotherapist does not have a duty to warn third parties or to confine a dangerous patient. *See* Majority opinion at pages 239–40. Under the majority's view, Wisconsin law not only allows such a holding but requires it. Such is not the case.

Furthermore, the majority goes beyond merely holding that a therapist's duty exists with respect to third parties; it proceeds to suggest, in general terms at least, what the scope of that duty is to be. The problems generated by the primarily dictum opinion are not saved by the disclaimer that expert testimony will be required to establish the standard of care.

Notwithstanding the majority's assertion to the contrary, it may well be appropriate to "engage in analytical gymnastics" to examine the existence of a duty as it relates to third parties to the physician-patient relationship. Majority opinion at page 238, n. 3. The concept that a person generally owes no duty to control the conduct of another has never been abrogated and replaced by "an imposition of an affirmative duty to act" (Majority opinion at page 13) in all cases where a third party is harmed, whether negligently or intentionally, by a patient. Certainly, before it is found that a psychotherapist has a duty to a third party to control the actions of his patient through confinement, it must, at a minimum, be established

that the therapist had an ability and a right to do so. Moreover, if the complaint is based on dangerousness, there should at least be required a reasonable inference that the patient was dangerous in the first instance, and the allegation of dangerousness must be based on something more than the fact that the person was being treated as an outpatient by a mental health practitioner. In addition, sec. 51.20(1)(a)1, Stats., requires the individual be mentally ill as well as dangerous.

Although it is true that *A. E. Investment* characterized Wisconsin negligence law as following the minority position in *Palsgraf,* the law in Wisconsin is more properly characterized as following neither the Cardozo majority in *Palsgraf,* which predicated liability on a very narrowly drawn scope of duty, nor the Andrews' dissent in *Palsgraf* which limited liability in negligence through causation based on policy factors. Rather, Wisconsin has actually followed its own distinct approach and limited liability through policy considerations after the elements of duty and causation have been established. *See generally* Comment, *The Existence of a Duty in Wisconsin Negligence Cases,* 61 Marq. L. Rev. 447 (1978).

We have previously stated that policy considerations limiting liability generally are best determined only after a full resolution of the issues at trial. *Coffey v. Milwaukee,* 74 Wis. 2d 526, 543, 247 N.W.2d 132 (1976). The majority cites three cases in which this court has previously determined a defendant's liability without the benefit of a full trial. However, those cases are quite distinguishable from the present case in at least two critical respects.

First, in each of those cases the court applied public policy considerations to limit a defendant's

liability, not to expand it. The court was effectively saying that under no conditions, regardless of any particular facts that might be revealed in the discovery process or at trial, would the plaintiff be permitted to recover because public policy precluded holding the defendant liable. This is quite different than speculating at the complaint stage what the policy considerations would be and then proceeding to decide the policy issues.

Second, in each of the cases cited by the majority, the complaint alleged facts sufficient to make a policy determination. Such is not the case here. In one of the very cases cited by the majority, *Hass v. Chicago & North Western Ry. Co.*, 48 Wis. 2d 321, 327, 179 N.W.2d 885 (1970), this court stated that: "There may well be cases, of course, where the issues are so complex, or factual connections so attenuated, that a full trial must precede the court's determination." The case at bar certainly presents complex and competing policy considerations; as such, this court is better advised to refrain at this point from making broad and sweeping pronouncements indicating how those considerations would be resolved if we had more facts.

Given that this case is returning to the trial court for a determination of Dr. Altenberg's negligence on the first theory of liability, it was unnecessary, as well as imprudent, for the majority to expound for three-quarters of the opinion on the two other bases for liability, both of which require substantial speculation.

The plaintiffs will be given ample opportunity to prove their case. It may well be that the legal issues with respect to failure to warn and failure to confine become moot as the facts become known. That is, if all

that is shown on discovery or at trial is that Mrs. Schuster was negligent in causing her daughter's injuries, then I would hold that there was no duty on the part of the doctor regarding failure to warn others and failure to seek the patient's confinement. The complaint sues for injuries sustained in an automobile accident[1] and there is no duty to predict negligent conduct. The pleadings in this case were inadequate and factually incomplete to serve as the basis for the policy determinations made by the majority. I would send the case back to the trial court with directions to permit the plaintiffs to amend their complaint.

Moreover, were I tempted to apply the public policy considerations as was done by the majority, I would resolve them in favor of the defendant, Dr. Altenberg. What we have here is a plaintiff injured through an ordinary car accident. There is no allegation or even an intimation in the complaint that Edith Schuster was homicidal, suicidal, or otherwise intended or desired to harm her daughter or herself. Any discussion about a psychotherapist's liability for failure to protect third parties from a dangerous patient

---

[1]The relevant portions of the amended complaint state:

"4) On July 29, 1983, GWENDOLYN SCHUSTER was badly injured in an automobile accident in Racine County wherein her psychiatrically ill mother, Edith Schuster, a patient of DR. ALTENBERG, was driving the car and was fatally injured.

"5) DR. ALTENBERG was negligent in his management and care for Edith Schuster in failing to recognize or take appropriate actions in the face of her psychotic condition, including failing to seek her commitment, to modify her medication, to alert and warn the patient or her family of her condition or its dangerous implications, and that this inappropriate care was a substantial contributing factor in causing the automobile accident and the injuries and damages sustained by the plaintiffs."

by its very nature implies that the claim is predicated upon the patient's intentional acts. The *Tarasoff* decision and its progeny all dealt with dangerous patients who intentionally harmed victims. This complaint, under the most liberal construction possible, does not even remotely suggest that there was any intentional behavior on the part of Edith Schuster, a voluntary outpatient in therapy, from which the plaintiff or anyone in the world needed protection. The majority would apparently hold psychotherapists to the duty of assessing a patient's potential for negligent behavior as well as for dangerousness.

Finally, in addition to considering prematurely several important public policy factors, the justification used by the majority to so easily dispense with the critical policy consideration of physician-patient confidentiality is suspect, at best. Section 905.04, Stats., of the Evidence Code is a specifically drawn exception to the physician-patient privilege of confidentiality and is to be narrowly construed. *See Alexander v. Farmers Mut. Automobile Ins. Co.,* 25 Wis. 2d 623, 628, 131 N.W.2d 373 (1964). Not every psychotherapist-patient relationship involves a mental illness or communication which will even implicate sec. 905.04. More importantly, this exception enables the treating physician legally to breach the patient's trust and divulge very private information received during psychotherapy when he or she deems it necessary and appropriate to institute commitment proceedings. The exception was not drawn to enable a battery of medical expert witnesses to expose the same privileged information received in confidence from a patient who was *not* involuntarily committed in a civil proceeding against the patient's therapist to prove in retrospect that the patient should have been confined. Nor does the APA

Code of Ethics authorize such a breach of confidentiality. What the majority conveniently overlooks is that both sec. 905.04 and the APA code recognize, in limited instances and for a limited purpose, the psychiatrist himself or herself may sometimes find it necessary to reveal patient confidences. It does not authorize others to use the information against the psychiatrist nor does it compel the psychiatrist to divulge privileged information. Any reliance on these codes is misplaced. The competing considerations of patient confidentiality and the need to protect society are not so easily resolved, nor should they be so summarily dismissed, particularly when a decision of these issues arguably implicates a far broader range of professional-client communication.

The issues of the existence and scope of a psychotherapist's duty to third parties for dangerous patients' intentional behavior pose interesting and important questions. However, those questions do not appear to me to be implicated here. I am reminded by this case of the court's statement in *Wilson v. Continental Insurance Cos.*, 87 Wis. 2d 310, 326–27, 274 N.W.2d 679 (1979) as follows: "Under the guise of notice pleading, the complaint before us requires the court to indulge in too much speculation leaving too much to the imagination of the court." Such is the case here. Were this complaint not saved by the allegations of negligent diagnosis and prescription of medication, I would resolve it in favor of Dr. Altenberg and affirm the decision of the trial court. Given that the plaintiffs do have the opportunity to prove their case, however, I would refrain at this point from deciding issues that are not clearly implicated in this case.

I am authorized to state that JUSTICES SHIR-LEY S. ABRAHAMSON and WILLIAM A. BAB-LITCH join this concurring opinion.